Beverly **BENZ** et al., Respondents below, Appellants,

v.

**WILMINGTON TRUST CO.**, Petitioner below, Appellee,

and

Franklin S. **Huber** et al., Respondents below, Appellees.

Supreme Court of Delaware.

Argued Jan. 13, 1975.

Decided Feb. 20, 1975.

S. Samuel Arsht and Paul P. Welsh, Morris, Nichols, Arsht & Tunnell, Wilmington, for respondents below, appellants.

Rodney M. Layton and Wendell Fenton, Richards, Layton & Finger, Wilmington, for petitioner below, appellee.

Melvyn A. Woloshin, Woloshin & Tenenbaum, Wilmington, for respondents below, appellees.

Before DUFFY and McNEILLY, JJ., and WRIGHT, Judge.

DUFFY, Justice:

This appeal brings up for review an order of the Court of Chancery granting summary judgment to adopted grandchildren (appellees) entitling them to participate as beneficiaries in certain trust distributions. Appellants are natural-born grandchildren and beneficiaries of the same trusts.

## I

The action began as a petition for instructions by the Trustee of six irrevocable inter vivos trusts, five of which were created by George F. Huber or his wife, who are the grandparents involved; the sixth trust was created by their deceased son, who was the father of the appellants and adoptive father of the appellees. Each instrument respectively designates "issue" or "grandchildren" or "children" as beneficiaries.

The pertinent facts appear in the opinion of the Vice Chancellor, (1973). As stated therein, the trusts were created in 1951 and the basic issue is whether the adopted children are, by virtue of 1952 statutes (13 Del.C. § 919(a) and 920(b)) members of the class of beneficiaries named in the instruments. The Vice Chancellor concluded that the case is controlled by the Supreme Court decision in Haskell v. Wilmington Trust Company, Del.Supr., 304 A.2d 53 (1973) and, finding that the documents were not ambiguous, he declined to consider extrinsic evidence of the trustors' intent. We think the Vice Chancellor correctly followed Delaware law as announced in *Haskell* and confirmed by Jackson v. Riggs National Bank of Washington, D.C., Del.Super., 314 A.2d 178 (1973).

▆▆▆ Respondents argue that the ambiguity recognized in *Haskell* and *Jackson* is present here since the pertinent words ("issue," "grandchildren" and "children") were unambiguous prior to 1952 but, as a result of the statutory changes, are now "reasonably susceptible to either" of two meanings. See Cleveland Trust Co. v. Wilmington Trust Co., Del.Supr., 258 A.2d 58

(1969). But that analysis mistakes the law announced in *Jackson* and *Haskell.* While it may be generally true that "when facts appear . . . [a] presumption recedes . . . ," 29 Am.Jur. Evidence § 159, the presumption applicable here and the test for rebuttal are prescribed with specificity in *Haskell.* Thus, it is the "documents themselves" that must demonstrate a "clear intent" to "limit the class as it was defined by law on the date of execution of the trusts."[1] It is a contrary content *in the instruments* that can rebut the presumption. And it is conceded here that there is no such content or intent in these trust agreements. In sum, these trust instruments do not demonstrate a clear and unambiguous intent to exclude adopted children who became, in the eyes of the law, full and equal children of the Huber family. Jackson v. Riggs National Bank of Washington, D.C., supra.

The Vice Chancellor was correct in his conclusion that *Haskell* is controlling and determinative and that the proffered extrinsic and parol evidence should be rejected.

## II

▆▆ Since the Vice Chancellor concluded that extrinsic evidence was inadmissible, he did not review the record and, as indicated above, he was right as a matter of law. But in view of the equitable contentions made by appellants at oral argument and because of the rather unusual circumstances, we have examined the record. And it is clear to us that, if the evidence were considered, it would not change the result.

1. Chief Justice Wolcott wrote in *Haskell*: "The Chancellor recognized that the law at the date of creation of the trusts would govern unless the instruments in question manifest a clear intent to the contrary. We think, however, that the better and more modern rule is that the applicable law to the determining of a class following the termination of a life interest is the law as it exists on the date of ascertainment, unless the documents themselves demonstrate a clear intent on the part of the creator to limit the class as it was defined by law on the date of execution of the trusts."

In brief, the record made by appellants is not probative of the trustors' intent at the crucially relevant time—i. e., when the trusts were created. Restatement Trusts, 2d § 4, Comment (a). See, e. g., Del Drago v. Commissioner of Internal Revenue, 214 F.2d 478 (2 Cir. 1954). The record shows a complete absence of intention as to adopted family members—the possibility was neither discussed nor considered when the trusts were created. Thus Elsie O. Huber testified:

"Q. Mrs. Huber, at the time of the creation of the five trusts in 1951 had you formed an opinion as to adopted children and how you would want them treated?

A. Now, this was 1951?

Q. 1951 when the five trusts were created.

A. Well, we hadn't any reason then to think anything about adopted children. No, I never formed any opinion.

Q. I see. So you had formed no opinion as to whether you wanted adopted children to take under this trust or not to take, is that correct?

A. I had never considered anything of the kind."

George F. Huber testified to the same effect:

"Q. Now, at the time you created your trusts in 1951, did the subject of adopted grandchildren or anyone being adopted into the family come up in 1951?

A. I had no thought of grandchildren at that time—I mean of adopted children.

Q. So there was no mention of adopted children or grandchildren in connection with your trust at the time you created it?

A. No, at that time.

Q. To your knowledge, that has to do with all 10 of these 1951 trusts which have been marked R-1 through R-10?

A. Yes."

Testimony as to subsequent intent of the trustor-deponents does not fill the void. In short, even if such declarations were properly admissible (and under the general rule they probably are not, IX Wigmore on Evidence (3 ed.) § 2471), at best they show what the settlors now say they "would" have intended had they considered the problem when the instruments were signed.

What the record does show is that it was not until 1964, thirteen years after the effective date of five of the trusts (and some forty years after the sixth), that the settlors formed any demonstrable intent as to adoptees.[2] That was the year when their son adopted the appellees. The settlors opposed the adoptions and their apparent response to it was to create new trusts (not here in issue) which expressly excluded adopted children.

\*    \*    \*    \*    \*    \*

Affirmed.

---

2. Mrs. Huber testified:
   "Q When did you first form an opinion as to the fact that you did not want the adopted children to take under this trust agreement or any trust agreement as if they would be a natural grandchild?

   A I feel we always had that. Every since they were adopted we must have had that idea."