**WILMINGTON TRUST COMPANY,** Trustee u/a with William H. Donner dated March 15, 1932; Successor Trustee u/a between William H. Donner and Montreal Trust Company dated August 6, 1940, and Trustee u/a with Dora Donner Ide dated October 28, 1940, Petitioner

v.

Phaedra ANNAN, Stephanie Kay Watters Hanson, Michelle Dutra de Amorim, and the minor and unascertained issue of Donner Hanson, Respondents.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 3, 1987.
Decided: June 18, 1987.

Richard G. Bacon, Richards, Layton & Finger, Wilmington, for Wilmington Trust Co.

John Biggs, III, Biggs & Battaglia, Wilmington, for Phaedra Annan.

Joseph H. Geoghegan, and Daniel F. Lindley, Potter Anderson & Corroon, Wilmington, Bank of California, Guardian of

the Estate of Stephanie Kay Watters Hanson.

Roger A. Akin, Sawyer & Akin, Wilmington, guardian ad litem for Michelle Dutra de Amorim and the unascertained issue of Donner Hanson.

BERGER, Vice Chancellor.

Wilmington Trust Company, in its capacity as trustee of three *inter vivos* trusts, filed this petition for instructions. William H. Donner ("William Donner") was the settlor of a trust created in 1932 (the "1932 trust") and of another created in 1940 (the "Montreal trust"). The third trust at issue was drafted at the direction of William Donner, but was executed in 1940 by one of his daughters, Dora Donner Ide ("Mrs. Ide" and the "Ide trust"). William Donner had at least three children—Mrs. Norment, Mrs. Ide and Robert Newsome Donner. Mrs. Norment had at least one child, Donner Hanson, who fathered one child in wedlock and one or more children out of wedlock.

The trust instruments contain references to the "issue" and "lineal descendants" of William Donner, Mrs. Norment and any children she might have. The trustee seeks instructions as to who should be included in the class or classes described by the terms "issue" and "lineal descendants" as used in the various trusts. Phaedra Annan Hanson ("Phaedra") is a legitimate child of Donner Hanson. There is no dispute as to her rights as a beneficiary under the trusts, and Phaedra argues that she is the only person entitled to take as a child of Donner Hanson. However, there are others who claim to be children of Donner Hanson entitled to share in the trust proceeds.

Stephanie Kay Watters Hanson ("Stephanie") is the daughter of Rose Watters Hanson, who married Donner Hanson after Stephanie's birth. Donner Hanson legally acknowledged Stephanie as his daughter in May, 1973, by stipulating to the entry of an order determining his paternity in a petition brought for that purpose in the District Court of Gunnison County, Colorado by Stephanie's mother. Michelle Dutra de Amorim ("Michelle") also claims to be a child of Donner Hanson. The record indicates that Donner Hanson was "romantically involved" with Michelle's mother approximately nine months before her birth. *See Norment v. Hanson,* Del.Ch., Civil Action No. 5822, Brown, V.C. (November 24, 1981). Donner Hanson never married Michelle's mother and there were no legal proceedings before or after Donner Hanson's death in 1976 through which his paternity was established. Finally, there is reason to suspect that Donner Hanson was the father of other unidentified illegitimate children. *See Norment v. Hanson, supra;* Will of Donner Hanson. This is the decision on cross-motions for summary judgment brought by Phaedra, the guardian for Stephanie, and the guardian ad litem for Michelle and the unascertained issue of Donner Hanson.

In construing a trust instrument, the court attempts to discern the settlor's intent as expressed by the instrument, read as a whole, in light of the circumstances surrounding its creation. *Dutra de Amorim v. Norment,* Del.Supr., 460 A.2d 511, 514 (1983). The words used in the instrument generally are given their ordinary meaning and the Court will not consider extrinsic evidence to vary or contradict express provisions of a trust instrument that are clear, unambiguous and susceptible of only one interpretation. *Bird v. Wilmington Soc'y of Fine Arts,* Del.Supr., 43 A.2d 476, 484 (1945); *Cleveland Trust Co. v. Wilmington Trust Co.,* Del.Supr., 258 A.2d 58, 65 (1969); *Wilmington Trust Co. v. Huber,* Del.Ch., 311 A.2d 892 (1973), *aff'd sub nom., Benz v. Wilmington Trust Co.,* Del.Supr., 333 A.2d 169 (1975).

With these principles in mind, I turn first to the 1932 trust. One-quarter of the corpus of that trust is presently distributable to Mrs. Norment's "respective lineal descendants per stirpes...." The income from the remaining three-quarters of the corpus is to be paid to Mrs. Norment's issue, per stirpes, until the death of the last survivor of her children or until the expiration of twenty years and eleven months after the death of the last survivor of six

named people, whichever occurs first. At that time, the trustee shall distribute the remaining principal to Mrs. Norment's then living issue per stirpes. If there are none, it will go to such of William Donner's issue as Mrs. Norment has appointed and, failing appointment, it will go to William Donner's issue, per stirpes. The trustee seeks instructions from this Court as to whether "issue" and "lineal descendants," as used in the 1932 trust, include the illegitimate children of Donner Hanson.

Stephanie and Michelle both assert that the meaning of these terms under Delaware law is clear and unambiguous. They begin with the proposition that the terms are synonymous, citing Black's Law Dictionary 530–531, 965 (4th ed.). They then refer to the Delaware law of decedents' estates and fiduciary relationships. 12 *Del.C.* § 101, *et seq.* Title Twelve of the Delaware Code begins with a definitional section that provides, in relevant part:

> For purposes of wills, intestate succession and for all other purposes under this title, the following definitions shall apply:
>
> (1) 'Child' includes any individual entitled to take as a child under this title by intestate succession from the parent whose relationship is involved and excludes any person who is only a stepchild, a foster child, a grandchild or any more remote descendant.
>
> (2) 'Issue' of a person means all his lineal descendants of all generations, with the relationship of parent and child at each generation being determined by the definitions of child and parent contained in this title.
>
> (3) 'Parent' includes any person entitled to take, or who would be entitled to take if the child died without a will, as a parent under this title by intestate succession from the child whose relationship is in question and excludes any person who is only a stepparent, foster parent or grandparent.
>
> (4) The definitions of 'child,' 'issue' or 'parent' contained in this section shall not limit the right of a testator to provide by will for a definition different from those contained in this section.

12 *Del.C.* § 101(1)–(4).

Subsections (1) and (3) refer to the law of intestate succession, which provides in relevant part:

> If, for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person:
>
> (1) An adopted person is the child of an adopting parent and not of the natural parent except that adoption of a child by the spouse of a natural parent has no effect on the relationship between the child and that natural parent.
>
> (2) In cases not covered by subdivision (1) of this section, a person born out of wedlock is a child of the mother. That person is also a child of the father, if:
>
> a. The natural parents participated in a marriage ceremony before or after the birth of the child, even though the attempted marriage is void; or
>
> b. The paternity is established by an adjudication before the death of the father or is established thereafter by preponderance of the evidence....

12 *Del.C.* § 508.

It is undisputed that Stephanie qualifies as a child of Donner Hanson for purposes of intestate succession pursuant to § 508(2)a and b. Accordingly, Stephanie argues that she has established a parent-child relationship pursuant to § 101 and qualifies as one of the issue and lineal descendants of Donner Hanson, Mrs. Norment and William Donner. Michelle and the other purported illegitimate children of Donner Hanson make a similar argument. The only difference, in their case, is that Donner Hanson's paternity has not yet been established. Michelle and those she represents argue that they should be entitled to share in the trust proceeds if they are able to establish that Donner Hanson was their father pursuant to § 508(2)b.

Stephanie and Michelle draw support for their position from a line of cases construing the word "issue" where the question was whether that term included people who

had been adopted. *Haskell v. Wilmington Trust Co.*, Del.Supr., 304 A.2d 53 (1973); *Jackson v. Riggs Nat'l. Bank of Washington, D.C.*, Del.Supr., 314 A.2d 178 (1973); *Benz v. Wilmington Trust Co.*, Del.Supr., 333 A.2d 169 (1975), *aff'g sub nom. Wilmington Trust Co. v. Huber*, Del.Ch., 311 A.2d 892 (1973); *Chichester v. Wilmington Trust Co.*, Del.Supr., 377 A.2d 11 (1977), *aff'g* Del.Ch., 369 A.2d 701 (1976). In those cases, the court construed the term "issue" by reference to appropriate sections of the Delaware Code including, in one case, some of the same statutory provisions relied upon here by respondents. Stephanie and Michelle argue that the reasoning by which adopted persons were held to be "issue" applies equally to illegitimates.

In order to understand Phaedra's arguments, *Haskell* and its progeny deserve some attention because of their analysis of what may be termed the "future law" question. In *Haskell*, the trust had been executed before 1952. At the time the trust was created, the adoption statutes did not recognize adopted children as the "issue" of anyone other than the adoptive parents. In 1952, with the enactment of 13 *Del.C.* §§ 919 and 920, adopted children were given the same rights and privileges as natural born, legitimate children, including rights of inheritance through and from their adoptive parents. Thus, the question in *Haskell* was whether the term "issue" should be defined by reference to the law in effect at the time the trust was created or the law in effect at the time of ascertainment of the takers following the termination of the life estate.

The Delaware Supreme Court adopted the "more modern rule," holding that the future law applies unless the trust instrument itself demonstrates a "clear intent upon the part of the creator to limit the class as it was defined by law on the date of execution of the trust." *Haskell v. Wilmington Trust Co.*, 304 A.2d at 54. The Court reasoned that if a settlor makes a devise to a class whose membership will only be ascertainable at an indefinite future time, he is presumed to have realized that the relevant statutes may change and

to have intended that the future law would control the disposition.

*Jackson* and *Benz* confirm the holding in *Haskell*. Taken together, these decisions establish, at least with respect to adopted children, that the term "issue" is unambiguous and "may not be explained away." *Huber*, 311 A.2d at 894. Accordingly, extrinsic evidence of the settlor's intent on this point has not been permitted. *See Benz*, 333 A.2d at 170; *Huber*, 311 A.2d at 894.

Phaedra argues that the *Haskell* future law rule should not be applied in this case and that the Court should consider extrinsic evidence which, in her view, establishes William Donner's intent to exclude illegitimates. Phaedra notes that the General Assembly reversed *Haskell* by enacting 12 *Del.C.* § 213, which provides, in relevant part:

> In the construction or interpretation of any will or trust, the following rule shall apply in the absence of any contrary expression of intent in such will or trust:
>
> \*     \*     \*     \*     \*     \*
>
> (3) Except where the will or trust instrument expressly provides to the contrary, the determination of a class shall be governed by the law in effect on the date the will or trust instrument becomes irrevocable.

This statute only applies to wills of decedents dying on or after August 1, 1984 and to trusts becoming irrevocable on or after that date. Accordingly, as Phaedra acknowledges, § 213 does not control the result here. However, she contends that, because the legislature has expressed a policy contrary to the *Haskell* rule, the holding in *Haskell* should be limited to its facts and applied only in a case involving adopted children.

Aside from the impact of § 213, Phaedra argues that *Haskell* is distinguishable because adopted children differ from illegitimates. The statutory requirements for adoption provide legal safeguards and formal sanction of a parent-child relationship. An illegitimate child, by contrast, may have no ties to the father or his family other than the biological relationship. Finally,

Phaedra argues that pragmatic considerations militate against treating illegitimates in the same fashion as adopted children. She describes the potential that an unknown illegitimate would be included in the class as an "administrative conundrum." Opening Brief at 18. Phaedra quotes at length from the case of *In re Will of Flemm*, N.Y.Sur.Ct., 381 N.Y.S.2d 573 (1975), in which the court expressed concern over how process could be served on illegitimate children who were unknown to the family. If the Court were to apply the *Haskell* rule in this case, Phaedra argues that the trustee would have to monitor the intestacy laws constantly to ensure that it was distributing income to the right individuals. The income beneficiaries might very well differ from the final distributees of principal because of additional changes in the intestacy law.

Phaedra says that application of the intestacy law in effect at the time the 1932 trust was executed would effectuate William Donner's intent, as determined from the trust itself and extrinsic evidence. The relevant statute provided:

A child conceived out of wedlock shall be legitimate if the parents shall intermarry before the birth of the child or if they shall intermarry after adjudication or acknowledgement of parentage or upon acknowledgement of the paternity made in writing by the parents, if both be living or by the father if the mother be not living and filed in the Prothonotary's Office of any County of the State. Any child legitimated solely by such acknowledgement shall not inherit from the father under the inheritance laws of this State.

32 *Del.Laws* Ch. 184 (1921), Ch. 88 *Del.C.* § 26 (Rev.Code 1935).

Phaedra reads this statute as excluding both Stephanie and Michelle and argues that this result comports with William Donner's intent. She points out that the 1932 trust contains a provision designed to exclude a child whose parentage was uncertain [1]:

Wherever reference is made in this instrument directly or indirectly to any issue or descendants of Donor, William H. Donner, such reference shall not include any person or persons being or claiming to be a child of said Robert Donner born prior to January 8, 1924, or any such person's descendants, but such person or persons and his, her or their respective descendants, heirs, executors, administrators and assigns are hereby definitely excluded from having any right, title, interest, estate or benefit under this trust in and to the property at any time held subject thereto.

With the aid of certain extrinsic evidence, including deposition testimony and Robert Donner's will, Phaedra contends that this provision was included in order to ensure that neither Richard Elliot Donner ("Richard") nor anyone claiming through him took under the trust. Richard was the child of Suzanne Elliot Donner ("Suzanne") and was born on August 16, 1921, when Suzanne was married to Robert Newsome Donner ("Robert"), the son of the settlor. The general consensus seems to have been that Robert did not sire Richard. Thus, the settlor did not wish to make Richard a recipient of his bounty and, since Richard was born before the cut-off date of January 8, 1924, the cited provision assured Richard's exclusion.

The parties agree that the exclusion in the trust document was a direct response to the circumstances of Richard's birth. However, they disagree as to the significance of that provision vis-a-vis William Donner's view of illegitimate children. Phaedra argues that this provision is an expression of the settlor's intent to exclude all illegitimates whereas Stephanie and Michelle argue that the trust provision is only evidence of an intent to exclude Richard, who was not believed to be part of the family blood line.

In addition to the trust provision, Phaedra points to other purported evidence of William Donner's intent. She relies upon Mrs. Ide's deposition testimony that William Donner was a man of high moral

---

1. A similar provision appears in each of the trust instruments under consideration.

standards who was brought up in a strict, religious household and who, in Mrs. Ide's opinion, did not approve of illegitimate children.

■ After careful review of the arguments and supporting authorities of the parties, I conclude that Stephanie qualifies as the issue and lineal descendant of Donner Hanson, his mother and his grandfather under the 1932 trust. I further conclude that Michelle and those similarly situated should be given an opportunity to prove, pursuant to 12 *Del.C.* § 508, that Donner Hanson was their father. If they are successful in that effort, they too will be included within the classes listed above.

The analysis must begin with the trust instrument. It uses the terms "issue" and "lineal descendant" but defines neither[2]. In this respect, the 1932 trust differs from the instrument construed in the recent case of *Dutra De Amorim v. Norment,* Del. Supr., 460 A.2d 511, (1983). There, the settlor had specifically included a definition of the term "issue" and the Court interpreted the instrument in light of that definition. The Court, likewise, finds no guidance as to the meaning of these terms from the circumstances surrounding the creation of the trust. The provision designed to exclude Richard at most evidences an intent to exclude those who, like Richard, are not part of the family blood line. Illegitimates may or may not fall into that category. For example, no one disputes the fact that Stephanie, an illegitimate, is Donner Hanson's daughter. In short, if the settlor's intent was to benefit only his blood relatives, the exclusion of all illegitimate issue would not effectuate that intent.

■ Inasmuch as reference to the trust instrument and the circumstances surrounding its creation does not provide any insight as to the meaning of the term issue, the Court must ascertain the legal meaning of that term. Notwithstanding Phaedra's argument, I conclude that the *Haskell* rule should be applied in reaching that determination. *Haskell* analyzed the future law problem as it applies to a class gift. The Court specified the process by which the meaning of the class term should be derived. There is nothing in *Haskell* to suggest that the meaning of the term "issue" should be determined in one way if the person claiming membership in the class is adopted and another way if the claimant is illegitimate. Accordingly, notwithstanding any differences between adopteds and illegitimates, I conclude that the approach authorized in *Haskell* should be followed here. As Phaedra concedes, application of the *Haskell* rule leads to the result announced above. *See* Opening Brief at 29, 30.

■ In reaching its conclusion, the Court has not considered extrinsic evidence of William Donner's intent. *See Benz v. Wilmington Trust Co.,* 333 A.2d at 170. However, if it had, the result would not change. There is no evidence that William Donner had any intent with respect to illegitimates at the time the trust was created. His daughter, Mrs. Ide, testified that she could not remember William Donner ever discussing the subject of illegitimate children. All she was able to provide was her assessment that, based upon his upbringing and character, William Donner would not have approved of illegitimate children. Robert Donner, Jr., likewise, was only able to provide a general description of William Donner's character—that he was "the epitome of a Calvinist." Deposition of Robert Donner, Jr. at 31. This evidence provides no indication that William Donner had any intention with respect to whether "issue" would include illegitimates.

Phaedra also points out that a 1920 trust created by William Donner (not under consideration here) uses the words "lawful child or children or other lawful descendants." She comments that "[t]he word 'lawful' may have been of some importance to William." Reply brief at 3. It may well have, and were that word found in the 1932 trust, it might be indicative of some intent

---

2. It appears that the settlor used these two terms interchangeably and I find no basis for distinguishing between them. *See* 12 *Del.C.* § 101(2) ("'Issue' of a person means all his lineal descendants...."). Any reference to either term, therefore, will include both.

to exclude illegitimates. However, the fact that the word "lawful" appears in an earlier trust and is absent from all of the later ones, if anything, indicates an intent to broaden the class of issue. In sum, I conclude that even if the extrinsic evidence proffered by Phaedra were considered, it would not be probative.

■ Finally, I reject Phaedra's argument that illegitimates should be excluded from the relevant classes because of administrative difficulties. While it is true that the construction adopted by this Court may make administration of the trust more difficult, the same problems could arise in the case of an intestate distribution. The General Assembly presumably considered these problems and concluded that they were not insuperable and did not outweigh the policy of recognizing the rights of illegitimate children as expressed in § 508. I am not satisfied that mere administrative difficulty provides an appropriate basis on which to construe the trust instruments.

The foregoing analysis applies to the Montreal and Ide trusts as well. The relevant language of the Ide trust provides that the trustee shall distribute income to the issue of William Donner, per stirpes, until the death of the last survivor of the settlor and fourteen other named persons. At that time, the principal shall be distributed to the then living issue of William Donner, per stirpes. The instrument also contains an exclusionary provision essentially the same as that found in the 1932 trust.

■ The only relevant distinction between the Ide trust and the 1932 trust is that Mrs. Ide was the settlor. However, she testified that she was "just told to sign the paper and ... signed it...." Ide Deposition at 36. She had no intent with respect to the meaning of the term "issue" or any other term or provision of the trust. *Id.* Mrs. Ide's *post hoc* preference for legitimates is neither admissible nor probative. *Benz v. Wilmington Trust Co.*, 333 A.2d at 171; *Wilmington Trust Co. v. Chichester*, Del.Ch., 369 A.2d 701 (1976), *aff'd*, Del.Supr., 377 A.2d 11 (1977). Thus, for the reasons discussed with respect to the 1932 trust, I hold that Stephanie is the issue of Donner Hanson and William Donner and that Michelle and the unascertained purported issue of Donner Hanson are also issue if they are able to prove that Donner Hanson was their father.

■ The situation is somewhat more complicated with respect to the Montreal trust. It contains a provision stating that "all questions pertaining to its construction shall be determined in accordance with the laws of [the] ... Province [of Quebec]." Montreal Trust, Article XXI. Delaware courts will respect this choice of law if the jurisdiction selected has a material connection with the transaction. *Wilmington Trust Co. v. Wilmington Trust Co.*, Del. Supr., 24 A.2d 309, 313 (1942); *see also* 5 A.W. Scott, *The Law of Trusts* § 575 (3d ed. 1967). Although the trust is no longer being administered in Quebec, it once was, and it was established pursuant to the laws of that Province. Based upon these facts, I find a material connection and hold that the settlor's choice of law provision should be given effect.

■ The Montreal Trust provides, in relevant part, that income is to be paid to Mrs. Norment and, at her death, the trustee is directed to divide and set aside the capital in equal shares, one for each of her children then alive and one for each of her deceased children with issue then alive. With respect to the share of capital set aside for the issue of each of Mrs. Norment's predeceased children (Donner Hanson), the trustee is directed to "divide such share in equal shares *par souches* among such issue...." The beneficiaries are to receive income, at the trustee's discretion, until the age of 21, at which time the principal will be distributed to them.

In order to ascertain how Quebec law would bear on the construction of the Montreal Trust, the trustee sought the advice of Quebec counsel. Pursuant to D.R.E. Rule 202(e), the Court relies upon Quebec counsel's letter opinion as evidence of Quebec law. A Quebec court, following Quebec choice of law, would look to the law of a purported father's domicile to deter-

mine the legitimacy or illegitimacy of his purported children. Having done that, it would then apply Quebec substantive law to determine whether the child could take under the instrument as Donner Hanson's issue.

Donner Hanson's domicile at the time of Stephanie's birth was Colorado. According to Stephanie's uncontroverted representations, Colorado law mirrors present Delaware law. It accords to a child born out of wedlock the same status as a legitimate child if the natural parents marry or if paternity is established by an adjudication before or after the father's death. Colo. Rev.Stat. 15–11–109(1)(b). Since Stephanie has been legitimated as a matter of Colorado law, she would be included in the definition of "issue" as a matter of Quebec substantive law. *See* Opinion Letter of Ogilvy, Renault, p. 6; *Jack alias Mills v. Jack*, Que.Super., 65 S.C. 10 (1927).

At the time of Michelle's birth, Donner Hanson was domiciled in Florida. Under the Florida Probate Code, Michelle would be considered a lineal descendant of Donner Hanson if she were able to establish his paternity by adjudication. Florida Probate Code § 732.108 (1986 Supp.). Thus, Michelle could qualify as the issue of Donner Hanson under the Montreal trust if she were successful in establishing paternity under Florida law. The same would be true of any unascertained issue of Donner Hanson if the law of the state in which he was domiciled at the time of such child's birth provides for legitimation through adjudication.

The Court has considered Quebec counsel's opinion that the settlor's intent has considerable bearing on this question and that, as a matter of Quebec law, Stephanie would be considered "issue" but Michelle and those she represents would not. As to William Donner's intent, the evidence relied upon by Phaedra is the same for the Montreal trust as it was for the 1932 trust. Thus, for the reasons stated in analyzing the 1932 trust, I find that there is no evidence of any intent either to include or exclude illegitimates. As to the result that would obtain as a matter of Quebec law, I do not question Quebec counsel's conclusion, but find it irrelevant. According to Quebec counsel, Quebec law would not be applied to determine the status of the child as legitimate or illegitimate. Rather, the Quebec court would apply the law of the domicile of the father. Quebec counsel went on to analyze the question of legitimacy under Quebec law only because it was requested to do so. *See* Opinion of Ogilvy, Renault, p. 3.

In summary, the trustee is instructed to include Stephanie in the class of "issue" or "lineal descendants" as that term is used in each of the three trusts under consideration. Michelle and the unascertained issue of Donner Hanson shall also be included in those classes if they are successful in obtaining an adjudication of paternity in the appropriate jurisdiction. Accordingly, Phaedra's motion for summary judgment is denied and the motions of Stephanie and Michelle are granted.

IT IS SO ORDERED.