# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Margaret C. Ughetta, | ) | |
| Petitioner | ) | C.A. No. 7885-MA |
| | ) | |
| v. | ) | |
| | ) | |
| Mary Harding Cist, individually, as | ) | |
| Executrix of the Estate of John David | ) | |
| Cist, and as Trustee of the Supplemental | ) | |
| Trust Agreement of John David Cist, | ) | |
| Respondent | ) | |

## MASTER'S REPORT

Date Submitted:  January 7, 2015
Draft Report:
Final Report:  May 29, 2015

One of four beneficiaries of a now-irrevocable trust contends that the successor trustee should be removed for alleged breaches of fiduciary duty.  The successor trustee denies these claims and, in turn, seeks to forfeit 50 percent of this beneficiary's trust share under the no-contest provision of the trust agreement.

The four beneficiaries, one of whom is the successor trustee, are the surviving children of a married couple, each of whom settled a trust for the benefit of themselves and their children.  The beneficiaries' mother predeceased their father, and upon the father's death two years later, his successor trustee was directed by the provisions of the father's trust agreement to equalize the couple's lifetime and post-mortem gifts to their four children.  Petitioner has questioned the

successor trustee's administration of the father's trust. In 2011, after the beneficiaries all participated in a distribution the trust's tangible personal property (hereinafter "TPP"), petitioner refused to sign a receipt and release agreement. As a result, her TPP remains in storage controlled by the father's trust while her three siblings have taken possession of their TPP. Likewise, petitioner is dissatisfied with the process undertaken to equalize the beneficiaries' shares of their parents' lifetime and post-mortem gifts. Petitioner now contends that the equalization process was inconsistent with the terms of the father's trust agreement.

For the reasons that follow, I conclude that the successor trustee properly exercised her discretion in distributing the TPP and in following the equalization process established originally by the trustor during his lifetime. However, I also conclude that the beneficiary has not challenged the disposition or validity of the trust, but instead sought only to ensure its proper administration. As a result, she has not triggered the no-contest provision of the trust agreement. In order not to prolong this litigation, I am waiving a draft report and issuing this as my final report.

## I. FACTUAL BACKGROUND

The trustor, John David Cist (hereinafter "Mr. Cist") and his wife Mary S. Cist (hereinafter "Mrs. Cist") were the parents of four children: Dorothea Cist, Margaret C. Ughetta, David Cist, and Mary Harding Cist. During their lifetimes,

Mr. and Mrs. Cist were financially comfortable as a result of their own investments and family inheritances.[1] They accumulated possessions, including family heirlooms, and were reluctant to dispose of anything. At the same time, however, Mr. and Mrs. Cist were generous parents. They provided each of their children with a private college education and a credit card on the parents' account, and also paid some of the private school tuition of their grandchildren, among other gifts. Dorothea and Mary Harding apparently never married and have no children.[2] Margaret and her husband have four children who were in high school and college when Margaret filed her petition for an accounting and to remove Mary Harding as successor trustee. David and his wife have two younger children.

On May 21, 1991, Mr. and Mrs. Cist executed wills[3] and entered into trust agreements in their respective capacities as trustor of his and her own trust and as co-trustees of both trusts.[4] The provisions of Mr. Cist's trust agreement included the division of the trust fund upon his death, if his wife survived him, into a Unified Credit Generation Skipping Transfer ("GST") Trust, a Marital GST Trust, a Marital Trust and, possibly, a Resulting Trust. On June 30, 1993, Mr. Cist

---

[1] Respondent Mary Harding Cist's Single Compilation of Appendices (hereinafter "Mary Harding Compilation") at 2 (Affidavit of Mary Harding Cist).
[2] I use first names here for the sake of clarity, and intend no disrespect.
[3] Mary Harding Compilation at 130-156 (Wills of John David Cist and Mary S. Cist).
[4] *Id.* at 10-54 (Trust Agreement between John David Cist, Trustor and John David Cist and Mary S. Cist, Trustees).

executed a Supplemental Trust Agreement, in which he modified two sections that are not relevant here.[5] Mrs. Cist's trust agreement and supplemental trust agreement contained reciprocal provisions for the benefit of her husband, and identical provisions for her children.[6]

## A. Fairness Concerns

In 2006, David became aware that Margaret was receiving from her parents more gifts of family heirlooms than her siblings.[7] In a letter to his parents, David expressed his concern that jewelry, silverware, china, paintings, and furnishings "were leaking away" "by gift or eminent domain," giving rise to the appearance of favoritism.[8] In his letter, David stated that he was not concerned about monetary matters because he predicted that his parents' assets after taxes could be equalized without much difficulty despite the large sums of money or assets that already had been given to their four children.[9] However, David implored his parents to be fair

---

[5] *Id.* at 55-62 (Supplemental Trust Agreement between John David Cist, Trustor and John David Cist and Mary S. Cist, Trustee).

[6] *Id.* at 175 (Supplemental Trust Agreement between Mary S. Cist, Trustor, and Mary S. Cist and John David Cist, Trustees Dated December 20, 2006). Although the record does not include Mrs. Cist's pre-2006 trust documents, the similarity of the couple's 2006 Supplemental Trust Agreements and the coordinated history of their estate planning leads me to believe this was the case.

[7] *Id.* at 425 (Deposition of David B. Cist).

[8] *Id.* at 502-503 (letter from David dated about October 2008).

[9] *Id.* at 502. The large blocks to which David was referring in his letter were gifts of a house to David, a house to Mary Harding, financial assistance to Dorothea, and tuition payments for Margaret's children.

to the rest of their children when it came to the distribution of "historically important family artifacts."[10]

David's letter may have prompted Mr. and Mrs. Cist to reconsider their estate plans because on December 20, 2006, Mr. Cist executed another Supplemental Trust Agreement, in which he modified his previous trust agreement by restating it completely.[11] Mr. Cist's 2006 Supplemental Trust Agreement provided for the distribution of the trust fund, upon Mr. Cist's death, into: (1) a Generation-Skipping Transfer Tax Exemption Trust (hereinafter "GST"); (2) a Marital Trust in the event that Mrs. Cist survived her husband; and (3) a Residuary Trust. The provisions of the Marital Trust were complex and allowed Mrs. Cist to occupy the family residence in Wilmington, Delaware, for the rest of her life and, upon Mrs. Cist's death, provided for the transfer of this residence to Mary Harding, outright and free from trust.[12] The remaining Marital Trust was to be divided in equal shares for his children, with the following provisos: (1) the amount of

---

[10] *Id.* at 503.

[11] *Id.* at 63-116 (Supplemental Trust Agreement between John David Cist, Trustor, and John David Cist and Mary S. Cist, Trustees dated December 20, 2006). Mr. Cist also executed a new will on December 20, 2006, a first codicil to that will on July 17, 2009, and a second codicil to that will on January 6, 2010. *Id.* at 157-161. The codicil provisions are similar to the amendments to the Supplemental Trust Agreement, i.e., Mary Harding was named executor of Mr. Cist's estate, a no-contest provision was added to the will, and a provision concerning the TPP was added to the will. Since most of Mr. Cist's property was held by the Trust, including the TPP, *id.* at 129 (Transfer of Tangible Personal Property, dated January 6, 2010), I will refer solely to the Trust throughout this discussion.

$250,000 was to be treated as an advancement to Dorothea to reduce the value of the share set aside for her and to increase correspondingly the shares set aside for the other children of Mr. Cist; (2) the amount of $1,250,000 was to be treated as an advancement to David as above; and (3) if Mary Harding received the Wilmington residence, then the amount of $900,000 was to be treated as an advancement to Mary Harding as above.[13]   On December 20, 2006, Mrs. Cist executed a reciprocal 2006 Supplemental Trust Agreement, giving her husband the right to occupy the Wilmington residence for the rest of his life, and upon his death, for that residence to be transferred to Mary Harding outright and free of trust, with the same provisions regarding monetary reductions for advancements made to Dorothea, David, and Mary Harding.[14]   Only Margaret's shares of Mr. and Mrs. Cist's trusts were not subject to any reduction.

Mrs. Cist passed away on February 10, 2008.[15]   In August 2008, while Mrs. Cist's estate and trust were being administered, Mr. Cist sought the assistance of a different law firm to help him address the issue of prior gifts that had been made to

---

[12] *Id.* at 79, 83.
[13] *Id.* at 83-85.  Section II, Paragraph B (2)(m)(4) of Mr. Cist's 2006 Supplemental Trust Agreement directed the Trustee to reduce these amounts to take into account any other amounts to be treated as advancements for each child in his wife's trust. *Id.* at 85.
[14] *Id.* at 172-226.
[15] *Id.* at 1 (Affidavit of Mary Harding Cist)..

his children, and achieve his goal of treating his children equally and fairly.[16] Mary Harding made the initial phone call,[17] and Dorothea accompanied her father to the office of Joanna Reiver, Esquire. During the course of this representation, Mr. Cist authorized Reiver and her associate, P. Kristen Bennett, Esquire, to speak with Mary Harding, Dorothea, or David at different times, but never with Margaret.[18] In January 2009, after reviewing: (1) the most recent numbers for cumulative transfers/gifts made prior to Mrs. Cist's death, which had been prepared by Mr. Cist, Mary Harding and David; (2) Mr. Cist's December 2008 transfers for tuition and equalizing gifts totaling more than $900,000; and (3) draft Form 706 for Mrs. Cist's trust, Reiver recommended that Mr. Cist make equalizing distributions to his children "via lifetimes gifts to trusts" that Mr. Cist would establish for each of his children.[19] At this time, some of Mr. Cist's children and his attorneys were concerned that Mr. Cist's continued gift-giving and transfers were depleting his estate and would make equalization impossible unless Mr. Cist made a complete distribution of his estate during his lifetime.[20] In July 2009, Mr. Cist authorized Reiver to prepare an irrevocable GST trust for each of his children. However, the issue of funding these trusts was very complex, given the character

---

[16] *Id.* at 472 (Deposition of Joanna Reiver, Esq.).

[17] *Id.* at 471-472.

[18] *Id.* at 473.

[19] *Id.* at 440-442 (Letter dated January 21, 2009, from Reiver to Mr. Cist).

[20] *Id*. at 443 (email from P. Kristen Bennett, Esq. to Reiver dated July 20, 2009).

of some of the assets and in light of expected changes in the federal transfer tax regime.[21]  Because of the uncertainty of the tax law and the exact amount of assets needed for each trust, Reiver recommended that Mr. Cist wait until September 2010 to proceed with the funding.[22]  Although the four documents were signed by Mr. Cist,[23] the irrevocable GST trusts were never funded because Mr. Cist unexpectedly died on June 24, 2010, at the age of 90 years.[24]

## B.  Amendments to Mr. Cist's Trust

On July 19, 2009, Mr. Cist executed a First Amendment to 2006 Supplemental Trust Agreement of John David Cist,[25] which was intended by

---

[21] *Id.* at 443-444.

[22] *Id.* at 488 (Reiver Deposition).

[23] Mr. Cist, accompanied by one or more children, was expected to sign documents drafted by his attorney on January 4, 2010, but the family questioned whether the gifts should be made in 2009 or 2010.  Anticipating a lower gift tax rate in 2010, the attorneys were inclined for the GST transfers to occur in 2010.  Moreover, they had just received revised figures from David reflecting what he described as "the tally of cash and liquid assets transferred to each child as far back as we have records." The "big change," as David put it, was due to his "request to Dad that he allow the Cape Cod property to be assessed at its present value, rather than at its date of gift value."  *Id.* at 483-484.  (Exhibit Reiver 10 – E-mail correspondence beginning December 29, 2009 from David to Reiver and ending December 30, 2009 from Reiver to Bennett).

[24] *Id.* at 465 (Deposition of P. Kristen Bennett, Esq.).

[25] *Id.* at 117-124.  (First Amendment to Supplemental Trust Agreement of John David Cist).

Reiver as a "stopgap" measure pending an entire trust restatement.[26] The

background for this instrument was stated in Paragraph D of the First Amendment:

> D. This amendment is intended to express my goal that, insofar as possible, the combined estates of my late wife, Mary S. Cist, and me shall be divided into equal shares – one share for each child of ours living at the time of my death, and one share for each child of ours deceased at such time but with issue then surviving. For the purposes of this division:
>
> 1. The trustee shall add to the value of my wife's and my combined estates the cumulative value of transfers to our children (including transfers to, or for the benefit of, issue of a child as transfers to that child, and including payments made on behalf of a child or issue even if such payments were not deemed transfers under IRC Section 2503(e) for gift tax purposes) made by my wife and/or made by me during our lifetimes, as well as made upon death pursuant to my wife's will and/or trust and/or pursuant to my will and/or trust, as well as by beneficiary designation. These gifts shall be included at their date-of-gift (i.e., transfer) values.
>
> 2. After calculating the aggregate amount to which each child (or issue of a child) has received and is entitled to receive from all sources as provided above, the trustee shall modify (i.e., reduce or increase) the shares for my children (or issue of a child) under this Agreement as necessary so that the aggregate amount received by such child (or issue of a child) from all such sources is equal to the aggregate amounts received by each other child (or issue of a child) of mine from all such sources.
>
> 3. Such equal shares shall be further modified (i.e., reduced or increased) if required pursuant to the No-Contest Provision included below.
>
> 4. Although I intend to amend this Agreement by complete restatement to provide detailed instructions for such equalizing distributions, I execute this interim amendment to my Agreement to express my intent, and I direct that my trustee take all

---

[26] *Id.* at 438-439 (email from Reiver to Reiver dated November 18, 2008); Id. at 443-444 (email from Bennett to Reiver dated July 20, 2009); *Id.* at 464 (Bennett Deposition).

necessary steps upon my death to distribute my estate and trust to achieve my intent as nearly as possible.[27]

Mr. Cist then modified his 2006 Supplemental Trust Agreement, first by modifying Section II, Paragraph B by deleting it in its entirety and substituting a new Paragraph B-3, as follows in pertinent part:

> 3. <u>Residuary Trust</u>.
>
> Trustee shall hold and administer all of the remainder of the trust fund that is not disposed of by the previous provisions of this Agreement (hereinafter referred to as the "Residuary Trust") in accordance with the provisions of this Paragraph 3 of this Subsection B.
>
> (a) The trustee shall distribute the trust's entire interest in [the Wilmington residence] to Trustor's daughter, Mary Harding Cist …. Such distribution shall be added to such child's trust share as provided in subparagraph (b) and described in subparagraph (c) below, as an addition to such child's trust share.
>
> (b) After the distribution provided in the preceding subparagraph, the trustee shall then divided the then-remaining amount of principal into shares for the benefit of each child of mine who survives me, …, to effectuate my intent as described in Paragraph D of this First Amendment to Supplemental Trust Agreement, above. …..[28]

Mr. Cist's second modification was to add a new Paragraph C to Section II, as follows:

> C- No-Contest Provision

---

[27] *Id.* at 117-118.
[28] *Id.* at 118.

If any beneficiary under this instrument files an action in any court seeking to set aside any aspect of the document, or to challenge any aspect of the disposition provided herein, the bequest to such beneficiary shall be partially ineffective and void, and the bequest such beneficiary would have received, but for such challenge, shall be reduced by one-half (i.e., fifty percent). The contestant's share shall also bear the costs of attorneys' fees and costs incurred by the contestant as well as attorneys' fees and costs incurred by my fiduciaries in defending the action. The portion by which such contesting beneficiary's bequest is reduced shall be distributed in equal shares to the non-contesting beneficiaries. The provisions of this provision shall also apply to specific takers in default, if any provided in such bequest hereunder. This provision shall apply in the case of challenges based on fraud, mistake, undue influence, or incapacity, or upon any other basis.[29]

A third modification, not relevant here, was followed by a fourth modification appointing Mary Harding as successor trustee in the event of Mr. Cist's incapacity or death and, if Mary Harding was unable to serve, then David was to be appointed in her stead.

On January 6, 2010, Mr. Cist modified his 2006 Supplement Trust Agreement a second time. The Second Amendment to Supplement Trust Agreement of John David Cist included Paragraph D, subsections 1 through 3 as recited above, but changed subsection 4 to state:

4. I intend to make substantial equalizing transfers during my lifetime after the execution of this supplemental trust agreement. Such lifetime equalizing transfers reflect my intent to devise my one-half interest in the [Wilmington residence] to my daughter Mary Harding Cist upon my death, by reducing my lifetime transfers to such daughter. The trustee shall take such transfers

---

[29] *Id.* at 121.

into account in making distribution hereunder to achieve my intent as nearly as possible, so that if such equalizing transfers were completed during my lifetime, upon my death my one-half interest in the [Wilmington residence] will be distributed to Mary Harding Cist, and the balance of my remaining estate and trust assets shall be divided equally among my children, …. [30]

Mr. Cist further modified his trust by adding a new Paragraph B-1 as follows:

B-1: <u>Tangible Personal Property</u>:

After my death, tangible personal property coming into the hands of the trustee shall be distributed as follows:

A. I anticipate that I may leave with my personal papers a memorandum expressing my desires concerning the disposition of certain items of tangible personal property. To the extent such memoranda are inconsistent, the last dated such memorandum shall control.

B. To the extent not disposed of by memorandum, I give all of my tangible personal property, together with all policies of insurance on that property, to those of my children who survive me, in equal (or as nearly equal as possible) shares. If my children are unable to agree upon a method of distribution among themselves, distribution will be by alternating selection in an order to be determined by the drawing of lots.

C. If the provisions regarding disposition of such property under this trust conflict with the disposition of such property under my will, the provisions of this trust shall determine the disposition of such property.

D. The cost of delivering tangible personal property to the residences of the beneficiaries shall be paid from my estate or trust as my executor determines to be appropriate in the circumstances, as an expense of administration.[31]

---

[30] *Id.* at 126. (Second Amendment to Supplemental Trust Agreement of John David Cist).

[31] *Id.*

During the process of revising his own estate and trust plans, Mr. Cist was assisted primarily by David, whom Mr. Cist had asked to help calculate the gifts that had been given to each child over the years.[32] David also worked with his father's attorneys and Victor Pelillo,[33] a certified public accountant who had been hired by Mr. Cist and David in October 2009 to review the list of gifts to the various children and grandchildren that they had compiled in connection with establishing irrevocable GST trusts for Mr. Cist's children.[34]  When Pelillo questioned whether certain of the reported items should be counted as gifts, David responded directly to Pelillo after consulting with Mr. Cist.[35]  David gave a preliminary report of the allocations to Mary Harding.[36]  He gave Margaret and Dorothea copies of their preliminary tallies, and discussed Margaret's tally with her in person.[37]

## C. Trust Administration

Shortly after Mr. Cist passed away, Margaret, who had retained her own attorney, received copies of Mr. Cist's recent supplemental trust agreements and

---

[32] *Id.* at 426-428 (Deposition of David B. Cist).

[33] *Id.* at 426.

[34] Appendix to Petitioner Margaret C. Ughetta's Answering Brief in Response to Respondent's Motion for Summary Judgment (hereinafter "Ughetta's Appendix") at 136-137.  Mary Harding Compilation at 288 (Affidavit of Victor Pelillo).

[35] Mary Harding Compilation at 429 (David's Deposition), 454-457 (letter dated October 22, 2009 from Pelillo to Mr. Cist and David); at 460 (email dated October 25, 2009 from David to Pelillo).

[36] *Id.* at 6 (Mary Harding Affidavit).

codicils to his will.[38]  Margaret was surprised by the changes that had been made, and by the fact that Mary Harding was the sole executrix.[39]  In early August 2010, Margaret attended a meeting of the beneficiaries and was informed, among other things, that movers were waiting at the Wilmington residence for her to remove her personal items from this residence.[40]  Thereafter, during a conference call on August 24, 2010, the beneficiaries were invited to suggest ways of distributing the TPP.[41]  Margaret asked for an inventory of the TPP to be prepared, but Mary Harding decided against doing an inventory in light of the numerous items of TPP.[42]  During the summer of 2010 there was some discussion about setting a date for distributing the TPP, but Margaret's attorney objected to setting an artificial deadline, and requested instead that any agreement on a method of distribution await the preparation of an appraisal of the TPP.[43]  It had been Mary Harding's hope that the TPP selection would take place with all beneficiaries being present, but she abandoned this idea after she received a letter in March 2011 from another

---

[37] *Id.*

[38] *Id.* at 422 (Deposition of Margaret C. Ughetta).

[39] *Id.* at 422-423.

[40] *Id.* at 423.

[41] Ughetta's Appendix at 105 (Mary Harding Deposition).

[42] *Id.* at 107-108 (Mary Harding Deposition).

[43] Mary Harding Compilation at 546-548 (letter dated September 24, 2010, from Richard A. Popper, Esq. to Reiver).

attorney recently retained by Margaret, who appeared to be threatening litigation.[44]

Mary Harding subsequently hired Jeffrey Gibson, a paralegal for 30 years, who had experience in the distribution of several large estates with numerous items of TPP among multiple heirs,[45] as an independent overseer of the TPP distribution process.

### D. TPP Distribution

Gibson suggested a process for selecting and distributing the TPP in the J. David Cist Estate and Trust, and worked collaboratively with Mary Harding to finalize the process.[46] In a letter to the beneficiaries dated April 14, 2011, Gibson outlined the process whereby a week before the TPP division, the beneficiaries would have opportunities to visit the Wilmington residence and a few nearby storage facilities to view the TPP and add items to their selection list.[47] Each viewing would be by appointment, each appointment would consist of a three-hour block of time, and each beneficiary could have a total of three appointments during the six-day "viewing week."[48] After the viewing, each beneficiary was to create a list of items of TPP he or she wished to receive, and to rank these items in order of

---

[44] Ughetta Appendix at 108-109 (Mary Harding Deposition); at 260-261 (Letter dated March 15, 2011 from David J. Ferry, Jr., Esquire to Reiver).

[45] Mary Harding Compilation at 272-273 (Affidavit of Jeffrey S. Gibson).

[46] Ughetta Appendix at 127-128 (Deposition of Jeffrey S. Gibson).

[47] Mary Harding Compilation at 277-281 (Letter dated April 14, 2011, from Gibson to four beneficiaries).

preference. Each beneficiary was to submit his or her priority order list to Gibson by a certain date, and the lists would remain completely confidential.[49] A selection order was to be determined at random by picking the names of the four beneficiaries out of a hat. Then Gibson was to follow the selection rotation (1,2,3,4/4,3,2,1/1,2,3,4) agreed upon by the beneficiaries in awarding items from their lists. If the item in that rank on a beneficiary's list had been taken by a prior bidder, the next ranking item would be advanced to that round. This process would be repeated until all lists had been completely exhausted, and then the beneficiaries would be notified of the items they had won. Since everything had already been appraised, the dollar sum of all items of TPP selected by each beneficiary would be totaled for equalization in the future. Movers were reserved to move the TPP to the out-of-state homes of Dorothea, Margaret, and David by the end of business on May 5, 2011,[50] and the beneficiaries were required to sign a release documenting that they had received all of their items. Any TPP remaining would belong to the Estate, to be disposed of in a manner determined by the Estate

---

[48] *Id.*

[49] Not all of the TPP was available for selection; thousands of unsorted textiles, family papers, unframed family photos, negatives, and home movies were among the sentimental items not to be divided during this process. Gibson's letter stated: "[these] categories of items should most logically be divided with the four of you sitting together and going through …." *Id.*

[50] During this time period, Dorothea resided in California, David resided in Massachusetts, Margaret resided in New York, and Mary Harding resided in Delaware..

Although Margaret had suggested the selection rotation order that ultimately was used,[51] she was unhappy with other aspects of the TPP viewing and division process. Margaret complained about many aspects of the process, including: (1) not having received an inventory and photographs of the TPP[52]; (2) not having enough time to view the TPP;[53] (3) not being allowed to bring her attorney and mother-in-law with her to view the TPP; (4) not having additional time to prepare and submit her priority order list; and (5) the process was more elaborate than the "drawing of lots" dictated in the second codicil of Mr. Cist's will.[54] Nevertheless, she participated in the process, and even attended the two auctions that took place during October 2011, where some of the remaining TPP was sold.[55]

### E. Equalization Process

In November 2011, Mary Harding, in her capacity as executrix of the Estate of J. David Cist and successor trustee of the J. David Cist Supplemental Trust Agreement,[56] retained Pelillo to collect information and compute "the total for

---

[51] Ughetta Appendix at 289-290 (email from Bennett to Ferry sent April 30, 2011).
[52] *Id.* at 107-108 (Mary Harding Deposition); Mary Harding Compilation at 534 (Margaret deposition).
[53] Ughetta Appendix at 125.1-125.3 (Margaret Deposition)
[54] *Id.* at 280-282 (letter dated April 22, 2011, from Ferry to Reiver); at 287-288 (letter dated April 29, 2011, from Ferry to Reiver); at 290.1-290.3 (letter dated July 7, 2011, from Ferry to Reiver).
[55] Mary Harding Compilation at 286-287 (letter dated August 15, 2011, from Gibson to beneficiaries).
[56] Mary Harding Compilation at 301-302 (November 1, 2011 engagement letter).

lifetime transfers made by J. David Cist and Mary S. Cist [including] lifetime transfers made to each of their four children including transfers to or for the benefit of the child's issue."[57]  Mary Harding sought to continue the equalization process her father had begun.[58]  Her attorney described the scope of the project to Pelillo as follows:

> For purposes of your calculations, please list transfers made by either or both parents beginning on July 1 of the year of each child's college graduation until the death of J. David Cist on June 24, 2010.  (The years of graduation will be provided by Mary Harding Cist.)  Transfers to a child include transfers to or for the benefit of the child's issue.  Tuition payments directly to a school are to be considered transfers to a child, even though not considered transfers for gift tax purposes.  Likewise, payments clearly made for the benefit of a specific child should be included even if the payments might be deemed support in some other context, because all the children were emancipated after college graduation.  Include all transfers, no matter how small.  My understanding is that many of the checks and other contemporaneous records have notations made by J. David Cist and/or Mary S. Cist identifying the child who received the benefit.  In addition, we have all gift tax returns filed by Mary S. Cist and J. David Cist, and will add those gifts to your calculations.  Transfers are included at their date-of-transfer values.[59]

By letter dated November 16, 2011, Pelillo informed the four beneficiaries that he had been retained to review their parents' financial records and "to compute the lifetime gifts and other transfers your parents made to you and/or your children,

---

[57] *Id.* at 301.
[58] Ughetta Appendix at 120 (Mary Harding deposition).

in accordance with your father's trust terms."[60] Pelillo outlined the records he had reviewed, the procedures he had followed, and provided the preliminary tallies of the lifetime gifts/transfers he had prepared for each beneficiary. He then described the inspection process whereby each beneficiary could make an appointment to inspect the records that he had reviewed in preparing the tallies, and the procedure the beneficiaries must follow to request changes or corrections to their tallies. Finally, Pelillo set forth a timetable for the inspection and review process, transmission of completed tallies, and last day (January 12, 2012) for additional corrections, warning the beneficiaries that no extensions would be permitted because January 17, 2012 was the deadline for the Estate to file IRS Form 8939 ("Allocation of Increase in Basis of Property Acquired From a Decedent").

Margaret objected to the "unreasonable deadlines" of the equalization process,[61] but ultimately cooperated with Pelillo's deadlines.[62] Nevertheless, Margaret reserved her right to challenge her tally and the distribution process.[63] The beneficiaries were informed of the outcome of the equalization process by

---

[59] Mary Harding Compilation at 298-299 (letter dated October 28, 2011, from Reiver to Pelillo).

[60] *Id.* at 304-309 (letter dated November 16, 2011, from Pelillo to beneficiaries).

[61] Ughetta Appendix at 305 (letter dated December 2, 2011, from Ferry to Reiver).

[62] *Id.* at 307-308 (letter dated January 10, 2012, from Thomas R. Riggs, Esq. to Reiver and Bennett).

[63] *Id.*

letter dated April 13, 2012,[64] which set forth the amounts each beneficiary had received in "lifetime gifts" and from Mrs. Cist's trust, the amount of Mary Harding's half-interest in the Wilmington residence, the total values of the TPP items each beneficiary had been awarded, and the amount of cash that was to be distributed to equalize each beneficiary's share of their parents' lifetime and post-mortem gifts. David, who had received the smallest distribution from Mrs. Cist's trust, was allocated nearly two-thirds of the equalizing cash that was to be distributed by Mr. Cist's trust. Mary Harding and Dorothea were to receive unequal shares of the remaining cash to be distributed by Mr. Cist's trust. Margaret, who had received the largest amount (in monetary terms) of lifetime gifts from her parents and the largest distribution from Mrs. Cist's trust, was to receive no cash at all from Mr. Cist's trust.[65]

## II. PROCEDURAL BACKGROUND

On September 21, 2012, Margaret filed a petition in this Court to compel an accounting, remove the trustee, and for other similar relief. In her petition, Margaret alleges that Mary Harding breached her fiduciary duties to the beneficiaries by violating the provisions of the second amendment of the trust regarding alternating selections of TPP to be determined by the drawing of lots,

---

[64] Mary Harding Compilation at 555-557 (letter dated April 13, 2012, from Bennett to beneficiaries).

and by refusing to answer Margaret's numerous requests for (a) information regarding the administration of the decedent's estate; (b) reconsideration of the onerous TPP distribution process; (c) modification or elimination of the release requirement to obtain her personal property; (d) information regarding the location and valuation of family history items and precious metals, and (e) reconsideration of the unreasonable and burdensome equalization procedure. The petition also alleges that Mary Harding has shown palpable hostility toward Margaret, which casts grave doubts on Mary Harding's ability to equitably administer the estate and trust and impairs the administration of the trust. On October 22, 2012, Mary Harding responded to the petition, denying the allegations, and counterclaiming that Margaret's petition violated the no-contest provision of the Trust. Accordingly, Mary Harding seeks an order reducing Margaret's bequest by half and holding Margaret's reduced bequest responsible for paying attorney's fees and costs incurred by both parties.

On July 16, 2013, Margaret moved to compel responses to discovery from Mary Harding; in particular, Margaret sought to compel the production of the TPP lists of the four beneficiaries, which she alleged were "relevant in determining whether the Equalization Process was carried out fairly and properly, and whether

---

[65] Margaret and her siblings also received equal in-kind distributions of shares of stock and precious metals from Mr. Cist's trust. *Id.*

each beneficiary's distributions were truly equal."[66]  Six days later, on July 22, 2013, Mary Harding filed a Motion for Summary Judgment and opening brief in support of her motion.[67]  In response, Margaret filed a Motion to Allow Discovery under Court of Chancery Rule 56(f) on July 31, 2013.[68]  While briefing was being completed on the above three motions, Margaret filed a Motion for Interim Relief on September 6, 2013, seeking an order directing the trustee not to sell or distribute some newly-discovered items of TPP and allowing Margaret unrestricted rights to view the property for as long as necessary, accompanied by experts and other agents in order to view, photograph and appraise the items.[69]  Oral argument on the pending motions was scheduled for September 30, 2013, but shortly before it could take place, the judicial officer assigned to this case discovered that she had a conflict that prevented her from hearing the matter.[70]  The case was reassigned to me on October 1, 2013.[71]  Following oral argument on the pending motions on November 12, 2013,[72] I issued a draft report on November 25, 2013, in which I recommended that the three motions be granted.[73]  The successor trustee took

---

[66] Ughetta's Motion to Compel, at ¶ 29.  Docket Item (hereinafter "DI") 16.

[67] DI 17 & 18.

[68] DI 22.

[69] DI31.

[70] DI 38.

[71] DI 39.

[72] DI 45.

[73] *Ughetta v. Cist*, Del. Ch., C.A. No. 7885-MA (Nov. 25, 2013 (Master's Draft Report).  DI 48.

exception to the draft report.[74]  After briefing, I slightly modified my draft report to reflect that the issue of whether the trust required equal (or as nearly equal as possible) appraised values of TPP to be received by each beneficiary had not yet been determined.[75]

On March 1, 2014, Margaret filed a second Motion for Interim Relief to prevent her videotaped deposition from being circulated publicly, which was granted,[76] and a Motion to Compel the production of a letter from the successor trustee documenting Mr. and Mrs. Cist's gift of a valuable autograph collection to David when he was eight years old.[77]  During a teleconference on Jun 13, 2014,[78] I asked the parties to submit legal memoranda on the issue of whether certain language in the trust was ambiguous, requiring the Court to consider extrinsic evidence to determine the trustor's intent.[79]  While the parties were submitting their legal memoranda, Margaret moved to compel the deposition testimony of W. Donald Sparks, II, Esquire, who had drafted Mr. and Mrs. Cist's wills and original supplemental trust agreements,[80] because David, in his capacity as co-personal representative of Mrs. Cist's estate, had asserted the attorney-client privilege for all

---

[74] DI 49.

[75] *Ughetta v. Cist*, Del. Ch., C.A. No. 7885-MA (April 30, 2014) (Master's Final Report).  DI 81.

[76] DI 61 & 72.

[77] DI 62.

[78] DI 93.

[79] DI 96.

communications between and among Sparks and Mr. and Mrs. Cist.[81]  On October 23, 2014, following oral argument on the pending motions, I issued an oral draft report in which I found that the phrase "during our lifetimes" was unambiguous, but that the phrase "the value of [our] … transfers to our children (including transfers to, or for the benefit of, issue of a child as transfers to that child …" was capable of having more than one meaning and was ambiguous.  I recommended that extrinsic evidence should be examined to determine the trustor's intent as to the latter phrase, but not as to the former one.[82]  I also recommended that Sparks' deposition go forward provided the questions were limited to the subject of trustor's intent as to the meaning of the transfer phrase.[83]  Since more than four years had elapsed since the death of Mr. Cist, the parties were anxious to move this matter along and agreed to a stay of the period of time of taking exceptions to my oral draft report.[84]  On December 15, 2014, Margaret filed her Answering Brief in

---

[80] DI 100.

[81] In a related matter, Margaret's husband, William C. Ughetta, Jr., as co-trustee of the Mary S. Cist GST Trust, is seeking a declaratory judgment against David, in his capacity as the other co-trustee of the Mary S. Cist GST Trust. *Ughetta v. Cist*, C.A. No. 9416-MA.

[82] Transcript of Oral Argument on October 23, 2014, at 39-41.  DI 121.

[83] *Id.* at 41-42.

[84] *Id.* at 76.

response to Mary Harding's Motion for Summary Judgment,[85] and Mary Harding's Reply Brief was filed on January 7, 2015.[86]

### III.   ANALYSIS

A motion for summary judgment may be granted if no genuine issue of material fact is in dispute and the moving party is entitled to judgment as a matter of law.[87] The burden is on the moving party to establish that there are no issues of material fact,[88] and the court must review all evidence in the light most favorable to the non-moving party.[89] Once the moving party has met its burden to show no material facts exist, the nonmoving party must submit "specific facts showing that there is a genuine issue for trial to survive a motion for summary judgment."[90]

Mary Harding claims that she is entitled to summary judgment because Margaret has failed demonstrate that the successor trustee breached her fiduciary duty to any beneficiary in distributing the TPP or in calculating the equalization tallies.  Mary Harding argues that since Margaret actively participated in the TPP distribution process, Margaret cannot now object to the process after the TPP has been packaged and shipped to Dorothea and David.  Similarly, Mary Harding

---

[85] DI 125.
[86] DI 127.
[87] Ct. Ch. R. 56.
[88] *Scureman v. Judge*, 626 A.2d 5, 10 (Del.Ch. 1992).
[89] *Id.* at 10-11.

argues that since she merely followed the equalization process established by Mr. Cist before his death, there can be no dispute that Margaret was treated fairly. Finally, Mary Harding claims that because Margaret has challenged the TPP distribution and equalization processes, her share of the trust should be reduced by 50 percent under the terms of the no-contest provision of the trust.

In response, Margaret argues that there is a factual dispute regarding what Mr. Cist intended to include as a "transfer" during his and Mrs. Cist's lifetimes, which presents a genuine issue of material fact. Margaret also argues that there are other material facts at issue, i.e., whether Mary Harding adhered to the language of the trust in allowing the beneficiaries to determine a method of distributing the TPP, whether Gibson's complex process of distributing the TPP was in keeping with the language of the trust, and whether Mary Harding's decision to start the equalization process calculation one month after each beneficiary graduated college was not only arbitrary, but also in direct conflict with the express language of the trust. Finally, Margaret responds that she has not triggered the no-contest provision because she has not challenged the validity of the trust or any of its dispositions. Instead, Margaret claims that she is challenging whether the successor trustee breached her fiduciary duty by failing to carry out the terms of

---

[90] *In re Novell, Inc. S'holder Litig.*, 2014 WL 6686785, at *6 (Del.Ch. Nov. 25, 2014) (quoting *Goodwin Live Entm't, Inc.*, 1999 WL 642565, at *5 (Del.Ch. Jan. 25, 1999), *aff'd,* 741 A.2d 16 (Del. 1999)).

the trust document and by acting hostilely toward one beneficiary. According to Margaret, summary judgment would be inappropriate because the Court should hear testimony to judge the demeanor and credibility of the parties and witnesses.

A. **The TPP Distribution Was Consistent with the Language of Mr. Cist's Trust**.

While represented by counsel and aware of the terms of Mr. Cist's estate planning documents, Margaret participated in the TPP distribution. Mary Harding now argues that because Margaret actively joined in the process, she should be required to accept it and the results of the process. According to Mary Harding, Margaret stood by while the TPP items selected by Dorothea and David were transported to their respective residences at trust expense.[91] Nor did Margaret object to the use of the TPP values in the equalization process. Therefore, according to Mary Harding, it is too late for Margaret to object. Margaret argues that her participation in the TPP distribution was not an indication of consent or acquiescence because she had no other option but to participate in the process or else risk receiving nothing. She also argues that the process used to divide the TPP

---

[91] The petition was filed on September 21. 2012, DI 1, more than a year after the TPP had been shipped to David and Dorothea's respective residences in Massachusetts and California in May 2011. Mary Harding Compilation at 280 (Gibson letter to beneficiaries dated April 14, 2011). Under the trust agreement, the successor trustee was directed to pay the cost of shipping the TPP as an administration expense. *Id.* at 126 (Section II, Paragraph B-1(c), Second Amendment to Supplemental Trust Agreement of John David Cist).

was not consistent with the express terms of her father's trust. As a result, Margaret argues that she is not estopped from challenging the trustee's actions by virtue of having participated in the TPP distribution, citing 76 Am.Jur.2d, *Trusts* § 327.

The general rule is that she "who participates in or acquiesces in an action has no standing in a court of equity to complain against it."[92] For the defense of acquiescence to apply, the claimant must have had full knowledge of her rights and the material facts and (1) remained inactive for a considerable time or (2) freely did what amounts to recognition of the complained of act, or (3) acted in a manner inconsistent with the subsequent repudiation, which led the other party to believe that the act had been approved.[93] Margaret appears to be suggesting that she was coerced into participating or else she might not have received any items of TPP. That the TPP is important to Margaret is evidenced by the fact that she filed this action in part to compel the successor trustee to release and ship to Margaret the items of TPP she had selected.[94]

The undisputed record shows that on numerous occasions before, during, and after the TPP distribution, Margaret voiced objections to and frustrated the

---

[92] *Gottlieb v. McKee*, 107 A.2d 240, 244 (Del.Ch. 1954); *Trounstine v. Remington Rand, Inc.* 194 A. 95, 99 (Del.Ch. 1937).
[93] *Klaasen v. Allegro Development Corp.,* 106 A.3d 1035, 1047 (Del. 2014) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del.Ch. 1998)).
[94] Petition to Compel Accounting, DI 1.

successor trustee's efforts to distribute the TPP. Discussions among the beneficiaries about the method of TPP distribution began on August 6, 2010. Margaret refused to agree to the standard selection rotation (1,2,3,4,/1,2,3,4/etc.) that the family had used in three previous TPP distributions, and she also refused to agree to a selection ordered to be determined by lots.[95] She would not agree with the other beneficiaries on a date for the distribution and, since Margaret's attorney wanted to wait until the creditor claims period ended, the TPP distribution was postponed until after February 24, 2011.[96] Meanwhile, Margaret objected to the appraiser Mary Harding had retained, so Mary Harding hired another appraiser to start the appraisal process anew.[97] A proposed distribution date of March 15, 2011, was changed, upon Margaret's request for a later date, to April 30, 2011.[98] By letter dated March 15, 2011, Margaret's new co-counsel contacted the trust's attorney with questions about several aspects of the estate and trust, including the

---

[95] Mary Harding Compilation at 2-3 (Mary Harding Affidavit).

[96] *Id.* at 3 (Mary Harding Affidavit).

[97] The successor trustee sent each beneficiary a copy of the complete appraisal report as soon as it was received. *Id.* at 3-4 (Mary Harding Affidavit). According to a letter from her counsel, partial appraisals were sent to the beneficiaries on March 22nd, April 14th, and April 22nd). *Id*. at 164-165. (letter dated April 22, 2011 from Reiver to Ferry). Margaret's counsel, however, claimed that the first time that he received any appraisal was April 14th. Ughetta Appendix at 280 (letter dated April 22, 2011 from Ferry to Reiver).

[98] In a letter to the trust's attorney, however, Margaret's co-counsel stated: "It is my understanding that your client Mary Harding Cist, has established a deadline date of April 9, 2011, to address the disposition of the tangible personal property." Ughetta Appendix at 260 (Letter dated March 15, 2011, from Ferry to Reiver).

TPP and the equalization tallies. Co-counsel wanted to see the TPP appraisal, and demanded "clear photos of every item and, for the rare books, a clear photo of each frontis page."[99] The March 15th letter concluded as follows:

> The above are just some of the initial things that require answers before we proceed. There may be additional questions later. I hope you are able to convince your client that she must provide this information and do so promptly. My client does want to bring this matter to closure promptly and hopes that information she has requested can be provided promptly in order to do so. However, if your client is unwilling to allow you to answer these questions and provide this information, I have told my client that litigation may be the only way to resolve this matter and, if necessary, that litigation will be filed.[100]

As a result of this letter, the successor trustee hired Gibson to oversee the TPP process. Gibson participated in a conference call with the successor trustee, her counsel, and Margaret's new co-counsel so that Gibson could explain his background and experience in TPP distribution, describe the upcoming process for this TPP distribution, and answer the questions of Margaret's attorney.[101] Nevertheless, Margaret continued to complain about the process. By letter dated April 22, 2011, Margaret complained that she: (1) had insufficient time to review the appraisals; (2) had not been provided photographs of the TPP, especially the frontis pages of the books; (3) had been denied prior access to the house to view the items; (4) had been denied the opportunity to have legal counsel and her

---

[99] *Id.* at 261.
[100] *Id.*
[101] Mary Harding Compilation at 273 (Gibson's Affidavit).

mother-in-law during the viewing periods; (5) had been denied a meeting with the successor trustee and her counsel; (6) had not been allowed to see the TPP lists of the other beneficiaries; (7) had been denied the opportunity to select items that might be left over after the other beneficiaries had made their selections; and (8) been refused a copy of the letter allegedly signed by Mr. and Mrs. Cist gifting the autograph collection to David in 1970.[102]  In response to Margaret's complaints, Mary Harding and David changed their schedules to accommodate Margaret, and David even offered Margaret one of his TPP viewing time slots, which she declined.[103]  Margaret also wanted to submit her priority selection list two days after the deadline of April 30th,[104] and on May 3rd, Margaret e-mailed Gibson to ask if she could add more items to her TPP list.[105]  None of her requests was granted by Gibson because it would have given Margaret preferential treatment over the other beneficiaries.  After the TPP was selected, all the beneficiaries except Margaret signed the receipt and release agreement drafted by the trust's attorney.  Gibson therefore arranged for the storage of Margaret's items until such time as Margaret

---

[102] Ughetta Appendix at 280-282 (letter dated April 22, 2011 from Ferry to Reiver).

[103] Mary Harding Compilation at 273 (Gibson's Affidavit); *Id.* at 167 (email dated April 30, 2011 from Bennett to Ferry).

[104] *Id.* at 273 (Gibson's Affidavit).

[105] *Id.* at 274.

signed the agreement.[106]  Negotiations to resolve this particular dispute failed after

Margaret refused to sign a revised form of receipt and release agreement.[107]

It is not necessary for me to reach the issue of acquiescence.  Regardless of

whether Margaret freely participated in the TPP process or not, she has failed to

demonstrate the existence of a genuine issue of material fact regarding the

successor trustee's impartiality in distributing the TPP.  Mr. Cist's trust stated:  "If

my children are unable to agree upon a method of distribution among themselves,

distributions will be by alternating selection in order to be determined by the

drawing of lots."[108]  That is what occurred here.  On August 6, 2010, when the

beneficiaries first met to discuss the TPP distribution, the successor trustee tried to

get the beneficiaries to agree upon a method of distribution.   Margaret refused to

agree with the other beneficiaries on a selection order to be determined by lots

during this meeting and on a subsequent conference call.[109]  Since Mr. Cist's

children were unable to agree upon a method of distribution, the successor trustee

turned to the default provision above – "distributions will be by alternating

selection in order to be determined by the drawing of lots."   Moreover, the

successor trustee did not breach her fiduciary obligations to the beneficiaries when

---

[106] *Id.*

[107] *Id.* at 5 (Mary Harding Affidavit); *id.* at 169-171 (email dated May 26, 2011 from Reiver to Ferry).

[108] *Id.* at 126.  (Second Amendment to Supplement Trust Agreement of John David Cist).

she retained an experienced estate administrator who used a process of alternating selections of items of TPP in an order that was determined by the random drawing of the beneficiaries' names out of a hat. Each beneficiary was treated impartially by the administrator. Each beneficiary was given the same opportunity to view the TPP and make a priority selection list, and each beneficiary had the same chance of being awarded his or her selected items through a selection order that had been previously determined at random.

After the TPP distribution took place, Margaret sought and obtained a court order compelling the production of the other beneficiaries' TPP selection lists. Despite having obtained this information concerning her siblings' priority selections, Margaret has been unable to point to any specific evidence of unfairness or lack of impartiality during the TPP distribution process. Since Margaret has failed to demonstrate the existence of a genuine issue of material fact, the Court should grant summary judgment in favor of Mary Harding regarding her administration of the TPP distribution.

**B. The Successor Trustee Did Not Act in Bad Faith or Exceed her Discretion in Following the Equalization Process Established Mr. Cist During His Lifetime.**

---

[109] *Id.* at 3 (Mary Harding Affidavit).

Mary Harding argues that there is no dispute that Mr. Cist intended to make equalizing transfers, that he told his lawyers, his son, and his accountant what he intended, and there can be no doubt as to what he tried to achieve in the months before he passed away. According to Mary Harding, the language of Mr. Cist's trust requires the successor trustee to take into account Mr. Cist's pre-death decisions on what lifetime transfers to include in the equalization process. Margaret, on the other hand, argues that the phrase "during our lifetimes" is unambiguous, and that the successor trustee failed to follow the express provisions of the trust agreement. By recreating Mr. Cist's course of conduct before his death, her argument goes, the successor trustee exceeded the bounds of her discretion.

Delaware law is clear that when construing a trust instrument, "the Court attempts to discern the settlor's intent as expressed by the instrument, read as a whole, in light of the circumstances surrounding its creation."[110] The words used in the instrument will be "given their ordinary meaning and the Court will not consider extrinsic evidence to vary or contradict express provisions of a trust instrument that are clear, unambiguous and susceptible of only one

---

[110] *Wilm. Trust Co. v. Annan*, 531 A.2d 1209, 1211 (Del.Ch. 1987) (citing *Dutra de Amorim v. Norment*, 460 A.2d 511, 514 (Del. 1983)), *aff'd Annan v. Wilm. Trust. Co.*, 559 A.2d 1289, 12982 (Del. 1989)). *See also In re Pierls Family Inter Vivos Trusts*, 77 A.3d 249, 263 (Del. 2013).

interpretation."[111]   An ambiguity may exist if the terms are reasonably or fairly susceptible to different interpretations or may have two or more different meanings.[112]

I previously issued a draft bench report finding that the phrase "during our lifetimes" found in Paragraph D(1) of both the First Amendment and the Second Amendment of the Supplemental Trust Agreement of John David Cist was unambiguous.[113]   Upon further review of the trust instruments, I have decided *sua sponte* to modify my draft report after concluding that the phrase "during our lifetimes" is ambiguous when read in conjunction with Paragraph D(4) of the Second Amendment of the Supplemental Trust Agreement of John David Cist.

Paragraph D(4) states:

> 4.    I intend to make substantial equalizing transfers during my lifetime after the execution of this supplemental trust agreement. Such lifetime equalizing transfers reflect my intent to devise my one-half interest in [the Wilmington residence] to my daughter Mary Harding Cist upon my death, by reducing my lifetime transfers to such daughter. The trustee shall take such transfers into account in making distribution hereunder to achieve my intent as nearly as possible, so that if such equalizing transfers were completed during my lifetime, upon my death my one-half interest in the [Wilmington residence] will be distributed to Mary Harding Cist, and the balance of my

---

[111] *DiSabatino v. DiFerdinando*, 2002 WL 2005743, at \*2 (Del. Ch. Aug. 13, 2002) (quoting *Wilm. Trust Co. v. Annan*, 531 A.2d 1209, 1211 (Del. Ch. 1987)).

[112] *Id.* at \*2 n. 8 (citing *ABB Flakt, Inc. v. Nat'l Union Fire Ins. Co.,* 731 A.2d 811, 816 (Del. 1999)).

[113] Ughetta Appendix at 205 (Transcript of Oral Argument on October 23, 2014, at 40).

remaining estate and trust assets shall be divided equally among my children, … .[114]

 The third sentence of Paragraph (D)(4), which requires the trustee to "take such transfers into account in making distribution hereunder to achieve my intent as nearly as possible, so that if such equalizing transfers were completed during my lifetime …," is ambiguous.  It is unclear whether the phrase "such transfers" refers to Mr. Cist's intended lifetime transfers to Mary Harding in the second sentence or to his intended "substantial equalizing transfers" in the first sentence of Paragraph D(4).  In either case, it is unclear why the direction to the successor trustee is not predicated on the actual completion of his lifetime equalizing transfers.

When I issued my draft report on the parties' legal memoranda, I disregarded the language in Paragraph D(4) altogether because Mr. Cist had died prior to making the lifetime equalizing transfers.[115]  In doing so, I ignored a basic rule of construction that a court will prefer an interpretation that gives effect to each term of an agreement and avoids rendering language superfluous or uselessly repetitive.[116]  Upon closer reading, the third sentence of Paragraph (D)(4) only makes sense as providing direction to the successor trustee  -- in the event that Mr.

---

[114] Mary Harding Compilation at 126.
[115] Ughetta Appendix at 205.
[116] *Peierls Family Inter Vivos Trusts*, 77 A.2d at 265 (citing *O'Brien v. Progressive N. Ins. Co.* 785 A.2d 281, 287 (Del. 2001).

Cist died before he completed the substantial equalizing transfers[117] -- in order to achieve his goal of having each child receive an equal share of Mr. and Mrs. Cist's combined estates and lifetime gifts. If Mr. Cist had made the "substantial equalizing transfers" during his lifetime, his trust agreement would have been completely restated since there would have been no need for the successor trustee to have undertaken the equalization process set forth in Paragraphs D(1) and (D)(2). All that would have remained in Mr. Cist's estate and trust, after his one-half interest in the Wilmington residence had been distributed to Mary Harding, would have been divided into four equal shares. If Paragraph D(4) is not to be treated as superfluous, it must be read together with Paragraphs (D)(1) and (D)(2), and the resulting ambiguity warrants an examination of the extrinsic evidence concerning Mr. Cist's intent in making those lifetime transfers.

The record shows that in preparing to fund the four irrevocable GST trusts, Mr. Cist did not calculate the lifetime gifts to his children in a literal sense, i.e., he did not attempt to add up all the gifts and transfers to his children made over the course of his and Mrs. Cist's lives. Instead, he wanted to include only those gifts and transfers that had been made in the years following the children's graduation from college.[118] According to his attorney, Mr. Cist considered starting the

---

[117] The Second Amendment was executed on January 6, 2010, and Mr. Cist died a few months later on June 24, 2010.

[118] Mary Harding Compilation at 474 (Reiver Deposition).

calculations after the youngest child, Mary Harding, had graduated from college, but he concluded that it would be unfair to the three youngest children. Instead, he opted for a staggered beginning point, i.e., the calculation was to begin after each child graduated from college.[119] Many of the earlier records dating back to 1980 when Dorothea graduated from college were unavailable to Mr. Cist,[120] so he began with records from 1985.[121] Pelillo subsequently reviewed the lists of gifts and transfers that Mr. Cist and David had compiled.[122] Included on these lists was a large monetary gift to Margaret's husband on December 1, 2007,[123] which was allocated to Margaret, and a large monetary gift to David's wife on December 31, 2007, which was allocated to David.[124] After Pelillo was hired by Mr. Cist's estate and trust to prepare the equalization tallies, Reiver instructed Pelillo to attribute any gifts to Margaret's husband to Margaret's tally.[125] However, this instruction was not exclusively directed at Margaret. The tallies Pelillo

---

[119] *Id.* at 463 (Bennett Deposition).

[120] *Id.* at 463; id at 310-311 ("Overview" of Mr. Cist's Estate prepared by Mary Harding).

[121] *Id.* at 464 (Bennett Deposition).

[122] *Id.* at 137 (Deposition of Victor Pelillo).

[123] *Id.* at 148. In his deposition, Pelillo stated that the amount of this gift was $20,000. Exhibit A attached to Pelillo's letter dated October 29, 2009, to Mr. Cist and David, *id.* at 291-294, is the list that had been prepared by Mr. Cist and David. *Id.* at 295-296. It includes a gift of $20,000 to "William" and a gift of $24,000 to "Bill" on December 1, 2007; both gifts were included in Margaret's tally and, presumably, represent separate gifts to Margaret's husband and son, both of whom are named William. *Id.* at 296.

[124] *Id*. at 295.

subsequently prepared for Margaret and David included gifts and transfers to and for the benefit of both Margaret's and David's respective spouses and children.[126]

Margaret argues that the express trust provisions do not include transfers to spouses and the successor trustee's decision to start the equalization process one month after each beneficiary graduated college was not only arbitrary, but also directly and unfairly benefited David by shielding his autograph collections from being included in the process. The extrinsic evidence reveals, however, that the decisions to include gifts to spouses and to begin the calculation after each of Mr. Cist's children graduated from college had been made by Mr. Cist himself. The successor trustee's instructions to Pelillo were based on the information and records that Mr. Cist previously had provided to Pelillo. The successor trustee, therefore, was merely following the parameters that had been established by the trustor,[127] and did not breach her fiduciary duty when she completed the equalization process that had been started by Mr. Cist.

The record shows that Mr. Cist did not intend to include any gifts or transfers to his children before they graduated college, but he did intend to include gifts and transfers to his children after they had graduated from college, in addition to gifts and transfers to and for the benefit of his children's spouses and his

[125] *Id.* at 150, 154 (Pelillo Deposition).
[126] *Id.* at 327-339 (Margaret Final Tally); *id.* at 494-501 (David Tally).
[127] *Id.* at 120 (Mary Harding Deposition).

grandchildren. Margaret has pointed to no specific evidence of Mr. Cist having had a contrary intent that would create a genuine issue of material fact in dispute. Therefore, I recommend that summary judgment be granted in Mary Harding's favor regarding her administration of the equalization process.

**C. There Is No Cause for Removal or for Compelling the Successor Trustee to Provide an Accounting.**

Margaret argues that there are genuine issues of material whether she is entitled to an accounting and the removal of the successor trustee, and she buttresses hers argument by recapitulating all of her previous complaints against the successor trustee. Margaret accuses the successor trustee of being hostile towards her, and contends that there are legitimate questions whether the successor trustee acted with impartiality toward all the beneficiaries and whether or not she should be removed as trustee. Finally, Margaret claims that she is entitled to a complete accounting of all assets, receipts, income, expenses and debts of the estate and trust because her repeated requests for an accounting have been denied.

The record shows that the successor trustee put in place TPP distribution and equalization processes that were applied equally to the four beneficiaries. Each beneficiary was given the same amount of time to: (1) view the TPP and (2) prepare and submit a priority selection list. The selection process itself was done by rotation (as agreed upon by the four beneficiaries) in an order determined by the

random drawing of names out a hat. Similarly, each beneficiary was given the same amount of time to: (1) review the documents that provided the basis for Pelillo's initial equalization tally and (2) make revisions or corrections to his or her own tally provided there was supporting documentation for such revisions or corrections. The record shows that of the four beneficiaries, only Margaret objected to these processes and only Margaret demanded that exceptions be made for her. The failure to accord special treatment for Margaret does not demonstrate hostility or lack of impartiality on the part of the successor trustee.

Throughout the administration of this trust and estate, Margaret repeatedly requested information, photographs, appraisals and other documents from the successor trustee, and Margaret was provided with most, but not everything that she had requested.[128] Aside from Margaret's own subjective dissatisfaction with the successor trustee's responses, Margaret points to no evidence that the successor trustee acted hostilely or lacked impartiality when dealing with Margaret.[129]

---

[128] *Id.* at 231-263 (History of Questions & Responses). Ughetta Appendix at 260-323 (correspondence between Margaret's counsel and successor trustee's counsel between March 15, 2011 and July 11, 2012).

[129] One example Margaret gave to demonstrate the successor trustee's alleged failure to provide her with information is somewhat disingenuous. The requested information was described as letter requesting documentation that the beneficiaries had agreed to the TPP distribution process. Petitioner Margaret C. Ughetta's Answering Brief in Response to Respondent's Motion for Summary Judgment at 37. The actual letter instead requested documentation that **Margaret** had agreed to the TPP distribution process. Given Margaret's record of complaints about the TPP process, it is unlikely that such a document existed so the successor trustee

Similarly, Margaret has not shown cause for an accounting.[130] The fact that her repeated requests for an accounting have been denied in and of itself does not amount to cause for the Court to compel the successor trustee provide an accounting when the trust and estate are still in the process of being administered, there is a significant amount of TPP yet to be distributed, and fees and costs associated with this litigation and the storage of TPP continue to accrue. Therefore, I recommend that summary judgment be granted in favor the successor trustee on the issue of the trustee's removal and the requirement of an accounting.

### D. The No Contest Provision Has Not Been Violated by Margaret's Petition.

In her counterclaim, Mary Harding alleges that Margaret's petition violates the no contest provision of Mr. Cist's trust and, as a result, her bequests must be reduced by half and must bear the cost of attorneys' fees and costs incurred by Margaret as well as by the trustee. According to Mary Harding, the no contest provision is very broad, and Margaret's challenges to the TPP distribution and equalization processes fall within its scope. In addition, Mary Harding describes as "simply false" Margaret's contentions that information was withheld from her, and that Margaret has unjustly burdened the trust administration with her

_____

can hardly be faulted for failing to provide it. Ughetta Appendix at 299 (Letter dated August 3, 2011 from Ferry to Reiver).

[130] *See* 12 *Del. C.* § 3522(2). *See also* 1A C.J.S. *Accounting* § 44.

objections and numerous questions, despite all the information that had been provided to her.[131]   Margaret denies that she has challenged any disposition provided for in the trust, which would have constituted a violation of the no contest provision.   Instead, Margaret claims that she is challenging the administration of the trust in an effort to enforce the express language of the trust, i.e., the calculation of lifetime gifts to Mr. and Mrs. Cist's children and grandchildren in the equalization process, and the drawing of lots for the TPP distribution.

Paragraph C of Section II of the 2006 Supplemental Trust Agreement of John David Cist, as modified by the First Amendment, provides:

> If any beneficiary under this instrument files an action in any court seeking to set aside any aspect of the document, or to challenge any aspect of the disposition provided herein, the bequest to such beneficiary shall be partially ineffective and void, and the bequest such beneficiary would have received, but for such challenge, shall be reduced by one-half (i.e., fifty percent).  The contestant's share shall also bear the costs of attorneys' fees and costs incurred by the contestant as well as attorneys' fees and costs incurred by my fiduciaries in defending the action.  The portion by which such contesting beneficiary's bequest is reduced shall be distributed in equal shares to the non-contesting beneficiaries.  The provisions of this provision shall also apply to specific takers in default, if any, provided in such bequest hereunder.  This provision shall apply in the case of challenges based on fraud, mistake, undue influence, or incapacity, or upon any other basis.[132]

---

[131] Respondent Mary Harding Cist's Opening Brief in Support of Her Motion for Summary Judgment, at 42.
[132] Mary Harding Compilation at 121.

I do not include challenges to the administration of a trust within the scope of the catchall phrase, i.e., "upon any other basis[,]" of this provision because there is a distinction between a challenge to the propriety of a trustee's actions and an attack on the provisions of the trust itself.[133] Margaret is not seeking to alter or change any of the provisions of Mr. Cist's trust.[134] Instead, she is attempting to enforce the provisions regarding the TPP distribution and the equalization process according to their terms, as she has interpreted them. Mary Harding herself has argued that certain terms in Mr. Cist's trust are ambiguous. It is, therefore, reasonable for the parties to have advocated for different interpretations of the language of Mr. Cist's trust pertaining to the TPP distribution and the equalization process. While Mary Harding views this as an indirect challenge to the trust that has frustrated Mr. Cist's intent and prolonged the administration of the trust, courts do not view disputes over the interpretation of instruments as violating a no contest

---

[133] *See In re Vogel Sr. Living Trust*, 2010 WL 2136643, at * 7 (Mich. App. May 27, 2010); *Labantschnig v. Bohlmann*, 439 S.W.3d 269, 274 (Mo. App. E.D. 2014). .

[134] In her Reply Brief, Mary Harding argues that Margaret is trying to set aside specific trust provisions, pointing to Margaret's Answers to Interrogatories where she "objects' to being charged for her children's tuition in the equalization process. Respondent Mary Harding Cist's Reply Brief in Support of Her Motion for Summary Judgment at 23. Since Margaret has not challenged the inclusion of her children's tuition payments in the equalization process in either her Petition or her Answering Brief, I need not address this argument. Similarly, a removal petition does not challenge the trustor's selection of a successor trustee, only the selected trustee's performance of her fiduciary duties. *McCaslin v. England*, 2013 WL 127787, at *4 (Cal.App. 4 Dist. Mar. 29, 2013).

clause.[135]   Even though I now disagree with Margaret's interpretations of the trust's terms, I do not find that Margaret has violated the no contest provision of Mr. Cist's trust.

Finally, I decline to recommend the award of costs and expenses to Mary Harding as a matter of justice and equity.[136]   Other than claiming that Margaret has unfairly prolonged this litigation and made unsupportable allegations, Mary Harding has shown no evidence of bad faith on Margaret's part.   Given that Margaret does not appear to have been included in the numerous meetings, discussions, and correspondence concerning Mr. Cist's estate planning that occurred between and among her siblings, her father, her father's attorneys, and Pelillo beginning in August 2008 until Mr. Cist's death in June 2010, I do not find it surprising that Margaret has repeatedly sought information about and questioned the administration of her father's trust. [137]

---

[135] *See Donkin v. Donkin*, 58 Cal.4th 412, 433-436 (Cal. 2013) (citing statutory and common law).

[136] 12 *Del. C.* § 3585 provides:  "In a judicial proceeding involving a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorneys' fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."

[137] The record suggests Margaret may have been purposely excluded from these discussions.  Mary Harding Compilation at 460 (e-mail dated Oct. 25, 2009, from David to Pelillo:  "By the way, since my sister Margie is going to be with Dad this week, I'd prefer to keep the communications only by email, or my cell ……."); *id.* at 505 (e-mail dated Feb. 19, 2010, from Reiver to David: "I received a call last week from Richard J.A. Popper, Esq. and I spoke to Richard yesterday.  He is representing your sister Margie and her husband, and wanted to talk to me about …

**CONCLUSION**

For the foregoing reasons, I recommend that the Court grant Mary Harding's Motion for Summary Judgment in part as to Margaret's Petition to Compel Accounting and Remove Trustee, and deny in part as to Mary Harding's counterclaim for forfeiture under the no contest provision of Mr. Cist's trust. Instead, I recommend that the Court grant summary judgment in favor of Margaret as a matter of law on the counterclaim. This is my final report and exceptions may be taken in accordance with Rule 144.

        Respectfully,

        /s/ Kim E. Ayvazian

        Kim E. Ayvazian
        Master in Chancery

KEA/kekz
cc:   David F. Ferry, Jr, Esquire
      Edward M. McNally, Esquire

---

your father's planning. I told him I would discuss his phone call with my client, J. David Cist, to determine what, if anything, I am authorized to disclose and discuss."); *id.* at 452-453 (e-mail dated Feb. 26, 2010, from Reiver to Bennett: "Speaking of perfect storms, note that Richard Popper is representing Margaret and William Ughetta, and will be scrutinizing our actions to the extent he knows what we're doing. I haven't yet asked J. David Cist what, if anything, we are authorized to discuss or provided Richard.")